# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## NORTHERN DIVISION

| | | |
|---|---|---|
| RITAMAY V. BURRIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 2:04CV53ERW/MLM |
| | ) | |
| JO ANNE B. BARNHART, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## AMENDED REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This is an action brought pursuant to Title 42 U.S.C. § 405(g) for judicial review of the final decision of Jo Anne Barnhart ("Defendant") denying the application for Social Security benefits under Title II of the Social Security Act, 42 U.S.C. § 401 et. seq. filed by Plaintiff Ritamay V. Burris ("Plaintiff"). Plaintiff has filed a brief in support of her Complaint. Doc. 14. Defendant has filed a brief in support of her Answer. Doc. 15. This matter was referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636 (b)(1). Doc. 4.

## I.
## PROCEDURAL HISTORY

On October 15, 2002, Plaintiff filed an application for disability insurance benefits alleging a disability onset date of August 3, 2001. (Tr. 66). An Administrative Law Judge ("ALJ") issued an unfavorable decision on September 26, 2002. (Tr. 47-54). Subsequent to the unfavorable decision of the ALJ, Plaintiff amended her onset date to October 4, 2002. (Tr. 84). Plaintiff's application was again denied and she requested a hearing before an ALJ. (Tr. 60, 64). A hearing was held before ALJ

Thomas C. Muldoon on March 30, 2004.(Tr. 29). ALJ Muldoon found that Plaintiff was not disabled at any time through the date of the decision, April 27, 2004. (Tr. 22). Plaintiff filed a timely request for review with the Appeals Council which denied Plaintiff's request on July 21, 2004. (Tr. 6-9). In denying Plaintiff's request for review the decision of the ALJ became the final decision of the Commissioner.

## II.
## TESTIMONY BEFORE THE ALJ

**Testimony of Plaintiff:**

Plaintiff testified that, at the time of the hearing, she was forty-eight years old; that she completed high school; that she had special education because her "reading wasn't very good"; and that she went to school to learn to work in a doctor's office. (Tr. 32-33).

She further testified that she last worked at Scholastics as an ordering clerk which job involved putting books in boxes and counting books pursuant to orders; that she stopped worked at that job in October 2002 because she was physically unable to keep up with it, because it was depressing, and because it made her sick; that she previously worked in a child care facility for nine months through a government training program ; that she also worked at a manufacturing company as a machine operator for about ten years; that as a machine operator she had a quota; and that she stopped working as a machine operator because it was not necessary for her to work. (Tr. 34-35). Plaintiff said that when she worked at Scholastics her boss complained that she made mistakes and that she worked too slowly; that while she worked there she had to go to "Mid Mo" because she had panic attacks; that after she went to Mid Mo she went back to Scholastics working reduced hours in an effort to "take some tension away from [her] which might help [her] retain [her] ability to

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

work"; and that the reduced hours did not help. (Tr. 35-36).

Plaintiff also testified that at the time of the hearing she had been going to University of Missouri, Behavioral Health, for treatment for about two years; that for about three months she saw a person from Lighthouse Counseling every week; and that this person from Lighthouse Counseling reduced Plaintiff's visits to once a month. (Tr. 36).

Plaintiff testified that her children were removed from her home because Plaintiff was depressed and bipolar and that she asked DFS to place her children in a good home until she got well. Plaintiff testified that at the time of the hearing her children, who were ten, eleven, and twelve, were back in Plaintiff's home; that she was taking her children to counseling; and that DFS was helping her and making sure that she was okay. (Tr. 37).

When asked by the ALJ to describe her depression Plaintiff said that she "get[s] sloppy around the house"; that sometimes she "just can't deal with this"; that she tells her sons to please tell people to go home; that after people leave she calms down; that she cannot have "motion going around while" she tries to get herself back together; that when she has bad days she is tired and sleeps more; that there are days when she sits and watches television or turns on the radio; that sometimes she falls asleep watching television; that sometimes early in the morning she cannot be as prompt as she used to be and she "just slow[s] down"; that she has not had too many crying spells; and that she gets emotional and worries about her children. (Tr. 37-38, 40).

Plaintiff further testified that the medications which she takes do not make her tired. (Tr. 38).

Plaintiff testified that she goes to the grocery store once a week without help; that her checkbook is a mess; that she has difficulty cooking; that someone helps her once in awhile to make a list of things her children like to eat; that sometimes her children will not eat what she has cooked;

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

and that she keeps a lot of "TV dinners" for her children to eat. (Tr. 38-40).

Plaintiff further testified that Carol Hunt from Behavioral Health talks to her about ways Plaintiff can improve herself; that Ms. Hunt makes suggestions to Plaintiff such as that on a given day Plaintiff should clean her bedroom and not worry about anything else; and that Ms. Hunt is "real helpful." (Tr. 41-42).

**Testimony of Carol Hunt:**

Ms. Hunt testified that she is Plaintiff's community support specialist through Behavioral Health; that she has a bachelor of arts in psychology; that at the time of the hearing she had been involved with Plaintiff's case for about two and a half years, since August 2001; and that she first became involved with Plaintiff when she was working at Scholastics. Ms. Hunt said that at Scholastics Plaintiff was having difficulty concentrating and performing her tasks and that this company complained that Plaintiff was too slow, made a lot of mistakes, and "had a lot of [inaudible] speech [ ] with a lot of impulsive behaviors." (Tr. 42-43). Ms. Hunt said that the decision was made to reduce Plaintiff's hours as a result of her problems; that Plaintiff's problems continued after she began working part-time; and that Scholastics finally "let [Plaintiff] go." (Tr. 43).

Ms. Hunt further testified that at the time of the hearing she was seeing Plaintiff about every two weeks; that sometimes Plaintiff forgets that Ms. Hunt is coming; that Plaintiff sometimes comes to Ms. Hunt's office without an appointment in need of assistance; and that Plaintiff misses appointments because of her disorganization, poor concentration, and being unable to keep on track. (Tr. 44-45). Ms. Hunt testified that Plaintiff's house is "usually pretty disheveled" when Ms. Hunt arrives and that upon Ms. Hunt's visits to Plaintiff's house they focus on trying to improve Plaintiff's organizational skills so she can decrease her chaos. (Tr. 44). Ms. Hunt said that she notices when

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

Plaintiff is more depressed because Plaintiff sleeps more; after the children go to school Plaintiff will lay back down; she has seen Plaintiff sleeping past 10:00 a.m.; and there have been "a couple of times" when Plaintiff was in her pajamas after the children had gone to school. (Tr. 44-45). Ms. Hunt also said that when Plaintiff is more depressed she does not take care of herself as well; that she might not bathe every day; and that Plaintiff becomes anxious quite a bit. (Tr. 45). Ms. Hunt further testified that when Plaintiff is anxious she becomes physically sick; that she has a lot of racing thoughts; that she cannot get her words out; that she has a hard time following directions; and that she is "pretty" dependent. (Tr. 45).

## III.
## DECISION OF THE ALJ

The ALJ first noted that Plaintiff claimed disability based on bipolar disorder; that she previously filed for disability benefits in August 2001, alleging an onset date of August 3, 2001; that this claim was denied; that an ALJ issued an unfavorable decision on September 26, 2002, on the grounds that Plaintiff had returned to work at the substantial gainful activity level within twelve months of her onset date; and that subsequent to the unfavorable decision of the ALJ, at the request of her attorney, Plaintiff's onset date was amended to October 4, 2002, the date she stopped working full-time. (Tr. 15).

At Step 1 of the sequential analysis applicable to a determination of whether a claimant is disabled the ALJ found that Plaintiff had not engaged in substantial gainful activity since her amended onset date; that Plaintiff increased her work hours to full-time in August 2002; that Plaintiff said she stopped working in October 2002; that Plaintiff said that her reduced hours did not help her ability to work; that medical records of October 2002 show that Plaintiff was looking for a new job; that

5

Plaintiff collected unemployment from the State of Missouri during the first, second, and fourth quarters of 2003; and that Plaintiff was paid $384 by Kelly Services during the fourth quarter of 2004. The ALJ further considered that pursuant to federal and state law an individual cannot be eligible for unemployment compensation unless she alleges that she is ready, willing, and able to work. (Tr. 17).

At Step 2, the ALJ considered records from Plaintiff's doctors and counselors including records from Lighthouse Counseling Center and from University of Missouri, Behavioral Health Services ("Behavioral Health"). Plaintiff's records included medical notes of October 2002 stating that Plaintiff was applying for a new job and stating that Plaintiff was sleeping better, had increased energy, and was free of side effects from medication. Based upon Plaintiff's medical and counseling records, the ALJ determined at Step 2 that Plaintiff has a severe impairment. (Tr. 18).

The ALJ concluded that Plaintiff's allegations regarding her impairment are not totally credible. (Tr. 21). The ALJ further determined that Plaintiff's residual functional capacity limited her to skilled or semi-skilled tasks with which she is already familiar or else unskilled tasks that can be learned after a short demonstration or within thirty days. (Tr.21). The ALJ found that Plaintiff has a mild restriction of daily living and that she does not have any medically diagnosed physiologic or anatomic abnormality that could reasonably be expected to result in any limitation in Plaintiff's physical ability to perform basic work-related activities. (Tr. 21). The ALJ further found that Plaintiff can perform work activity at all exertional levels; that Plaintiff has some nonexertional limitations; and that Plaintiff is able to make a vocational adjustment to perform work that exists in significant numbers in the national economy. (Tr. 21). The ALJ also found that Plaintiff's determinable impairments do not prevent her from performing her past relevant work. (Tr.22). The ALJ, therefore, found that Plaintiff is not disabled.

6

In a Parenting Class Report dated November 19, 2001, Ann Elliot, L.C.S.W., stated that Plaintiff graduated from parenting class; that Plaintiff participated well in group activities; that she seemed willing to use some of Ms. Elliot's techniques; that Ms. Elliot continued to work with Plaintiff in individual therapy; and that "things still seem overwhelming to [Plaintiff]." (Tr. 123).

F.R.Conley, D.O, reported that Plaintiff was seen on February 15, 2002, at which time Plaintiff presented with problems of dizziness and break outs on her chin and chest and that Plaintiff reported that these problems started after Plaintiff started lithium; that her legs were aching; and that she was told by "psychiatry people" that she is bipolar. (Tr. 133).

Dr. Conley's records reflect that Plaintiff was seen on March 1, 2002, at which time Plaintiff complained that she was having problems getting out of a chair; that she felt weak; that she was breaking out on her face; and that she had not felt good since she had been on lithium. Dr. Conley reported that Plaintiff did not describe any double vision at that time and that notes in Plaintiff's file reflected that she had previously complained of double vision and that her medication was reduced as a result. (Tr. 134).

Records of Behavioral Health reflect that Plaintiff was seen in March and April 2002. Treatment notes of this date are not legible. (Tr. 138-41). Plaintiff states that March notes state that she was suffering from Bipolar Disorder and that April notes state that she was working part-time. Doc. 14 at 3.

Ms. Elliot reported on June 24, 2002, that in her professional opinion she was concerned about a decision that Plaintiff would work full-time. Ms. Elliot's report of this date further states that

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

Plaintiff was functioning adequately "but that I am afraid [that] to add more hours [to] her workweek would be too overwhelming for her and cause her to regress from her present productivity." (Tr. 125).

In an Update Progress Report dated July 11, 2002, Ms. Elliot stated that she was continuing to work with Plaintiff on a weekly basis; that she discussed with Plaintiff's son a safety plan he could implement while on visits if he becomes uncomfortable or afraid; that Plaintiff's son thought his visits were going well and that his mother was getting better; that Plaintiff's son reported feeling comfortable and safe and felt Plaintiff was being more consistent; that Plaintiff reported "the same"; that Plaintiff has worked up to a day visit with her son; that both Plaintiff and her son felt that they are ready for overnight visits; and that Ms. Elliot had concerns about Plaintiff's "limitations and difficulties but she has had most if not all the resources that are available to help her succeed." Ms. Elliot further reported that she was doubtful if Plaintiff "will be able to manage all her children but [she was] hopeful that she will be able to parent [this son] with success." Also Ms. Elliot's report of July 11, 2002, addresses conflicts between Plaintiff and the father of her children and states that it would help the children if tension could be reduced. (Tr. 126-28).

Records of Behavioral Health reflect that Plaintiff was seen on August 12, 2002. Records of this date reflect that Plaintiff was diagnosed with bipolar disorder, mixed, and general anxiety disorder and that Plaintiff was having anxiety attacks at work. Records of this date are otherwise not legible. (Tr. 146).

Ms. Elliot reported on August 23, 2002, in an Update Progress Report, that she was continuing to work with Plaintiff and her son; that "[t]hey have progressed wonderfully on their reunification efforts"; she was pleased at how well they were doing in regard to "their relationship,

8

communication and decision making ability"; that she had never seen Plaintiff "function better than she is right now"; that Plaintiff had "recently worked herself back up to full time at work"; that she "has really begun to assert herself appropriately in many different areas of her life"; and that Plaintiff has improved greatly in her decision making ability and emotionally is much more stable." (Tr. 129).

Records of Behavioral Health reflect that Plaintiff was seen on October 14, 2002; that Plaintiff was suffering from bipolar disorder, mixed, and generalized anxiety disorder; and that she had panic attacks. Records of this date are otherwise not legible. (Tr. 148). While the signature on notes of this date is not legible, this signature is arguably that of Dr. Favazza, as suggested by Plaintiff.

Records of University Hospital, University of Missouri Health Care, ("University Hospital") reflect that Plaintiff was seen on December 2, 2002, and that on this date Plaintiff reported that she was sleeping well; that things were "going good"; that she had decreased panic and paranoia and no mania; and that she was suppose to start a new job. Notes of this date are otherwise not legible. (Tr. 175). While the signature on notes of this date is not legible, this signature is arguably that of Dr. Favazza, as suggested by Plaintiff.

Records of University Hospital reflect that Plaintiff was seen on January 27, 2003, and that on this date Plaintiff reported that she had a good Christmas; that she still became a little paranoid at times; that she was filing for disability; and that she was receiving unemployment. (Tr. 179).

Records of University Hospital reflect that Plaintiff was seen on March 10, 2003, and that on this date Plaintiff reported that she felt good and that she had some anxiety in the morning. Notes of this date are otherwise not legible. (Tr. 182). While the signature on notes of this date is not legible, this signature is arguably that of Dr. Favazza, as suggested by Plaintiff.

Records of Behavioral Health reflect that Plaintiff was seen on May 5, 2003. Records of this

9

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

date are not legible. (Tr. 185). While the signature on notes of this date is not legible, this signature is arguably that of Dr. Favazza, as suggested by Plaintiff.

Dr. Jon Colen examined Plaintiff and conducted a Medical Assessment of Ability to Do Work-Related Activities (Mental) on June 9, 2003. Dr. Colen reported on this date that Plaintiff's abilities were fair in the following areas: following work rules, relating to co-workers, dealing with the public, using judgment, it interacting with supervisors, dealing with stresses, functioning independently, and maintaining attention/concentration. In regard to Plaintiff's ability to make performance adjustments, Dr. Colen reported that Plaintiff was fair in the area of understanding, remembering and carrying out complex, not complex, and simple job instructions. In regard to Plaintiff's ability to make personal-social adjustments, Dr. Colen reported that Plaintiff's ability was good in the area of maintaining personal appearance and that it was fair in the area of behaving in an emotional stable manner, relating predictably in social situations, and demonstrating reliability. Dr. Colen also reported that his clinical findings were that Plaintiff had chronic anxiety, sleep problems, and other difficulties and that these findings supported his conclusions regarding Plaintiff's abilities. Dr. Colen also said that Plaintiff can manage benefits in her own best interest. (Tr. 121-22).

Records of Behavioral Health reflect that Plaintiff was assessed on June 17, 2003. This Assessment, which is signed by Rande Buss and by Dr. Favazza, states that Plaintiff's children were recently returned to her from DFS custody; that since the return of her children Plaintiff had increased stress and anxiety; that she was experiencing a lot of frustration and crying spells; and that she reported depression and hopelessness. (Tr. 195). The Assessment further states that Plaintiff had severe symptoms in regard to "marriage/ relationships/family" and "jobs/school/performance"; that she had moderate symptoms in regard to "friendships/peer relationships," activities of daily living, and

10

ability to concentrate; and that she had minimal symptoms in regard to financial situations, "hobbies/interests/play activities," and ability to control her temper. The June 17, 2003 Assessment also states that Plaintiff's appearance was sloppy; that her house was a mess; and that in regard to her ability to concentrate Plaintiff had minor problems and totally blocked people out when she did not want to deal with issues. This Assessment recommended that Plaintiff see a psychiatrist and a case worker; that she take medications as needed; that she develop parenting skills to assist with her children; that she increase her social skills and social activity; that she develop communication skills; and that she develop a proper diet. (Tr. 195-200).

Progress Notes from Behavioral Health reflect that Plaintiff was seen on July 28, 2003, on which date Plaintiff reported high anxiety in the morning "which improves as the day goes on." Records of this date are otherwise not legible. (Tr. 187). Progress Notes from Behavioral Health further reflect that a treatment team meeting was held on August 18, 2003. It was reported on this date that Plaintiff had complex medical issues, including sleep apnea. (Tr. 188).

Plaintiff's attorney submitted interrogatories to a vocational expert ("VE"). On March 17, 2004, in response to these interrogatories,, the VE concluded that there is no work in the national economy which the individual described in each of two hypotheticals could perform. (Tr. 114-15). The first hypothetical stated as follows:

> Please assume a hypothetical individual who was born on August 6, 1955, who has had past work experiences set out in her Work History Report and has been found by a psychiatrist to have a "fair" ability to follow work rules, relate to co-workers, deal with the public, use judgment, interact with supervisors, deal with work stresses, function independently, maintain attention/concentration, behave in an emotionally stable manner, relate predictably in social situations, and demonstrate reliability. "Fair" is defined as "Ability to function in this area is seriously limited, but not precluded.

11

The second hypothetical states as follows:

> Please assume a hypothetical individual who was born on August 6, 1955, who has had past work experiences set out in her Work History Report and has been found by a psychiatrist to have a "fair" ability to follow work rules, deal with the public, and use judgment. "Fair" is defined as "Ability to function in this area is seriously limited, but not precluded. Assume further that this individual has a "poor or none" ability to deal with work stresses and maintain attention/concentration. "Poor or none" is defined as "No useful ability to function in this area."

(Tr. 114-15).

Dr. Howard Houghton examined Plaintiff and conducted a Medical Assessment of Ability to Do Work-Related Activities (Mental) on January 12, 2004. Dr. Houghton's Assessment of Plaintiff states that Plaintiff's abilities were fair in the following areas: following work rules, dealing with the public, using judgment, understanding, remembering, and carrying out simple and detailed but not complex job instructions. Dr. Houghton reported that Plaintiff's abilities were good in the following areas: relating to co-workers, interacting with supervisors, and functioning independently. He reported that Plaintiff's abilities were poor to none in the following areas: dealing with stress, maintaining attention and concentration, and understanding, remembering, and carrying out complex job instructions. (Tr. 173-74). In this Assessment Dr. Houghton did not complete the portions of the form requesting that the examiner "[d]escribe any limitations and include the medical/clinical findings that support this assessment"; requesting that the examiner rate the claimant's abilities in the area of making personal-social adjustments; requesting that the examiner state "any other work-related activities, which are affected by [the claimant's] impairment, and indicate how the activities are affected"; and requesting that the examiner evaluate the claimant's capability to manage benefits. (Tr. 174).

Progress notes from Behavioral Health reflect that Plaintiff was seen on January 26, 2004.

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

Notes of this date state that Plaintiff was "doing reasonably well with mood and anxiety," and that she had some "interpersonal issues with children." Records of this date are otherwise not legible. (Tr. 194). While the signature on notes of this date is not legible, this signature is arguably that of Dr. Favazza.

Progress notes from Behavioral Health reflect that Plaintiff was seen on March 22, 2004. Notes of this date state that Plaintiff is bipolar; that her mood was good; that she was generally doing well and sleeping well; that her children were reportedly doing well; that she did not complain of "side effect[s]"; and that she reported being "generally stable." (Tr. 193).

## V.
## LEGAL STANDARDS

Under the Social Security Act, the Commissioner has established a five-step process for determining whether a person is disabled. See 20 C.F.R. § § 416.920, 404.1529. In this sequential analysis, the claimant first cannot be engaged in "substantial gainful activity" to qualify for disability benefits. See 20 C.F.R. § § 416.920(b), 404.1520(b). Second, the claimant must have a severe impairment. See 20 C.F.R. § § 416.920(c), 404.1520(c). The Social Security Act defines "severe impairment" as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities …" Id. Third, the ALJ must determine whether the claimant has an impairment which meets or equals one of the impairments listed in the regulations. See 20 C.F.R. § § 416.920(d), 404.1520(d); Part 404, Subpart P, Appendix 1. If the claimant has one of, or the medical equivalent of, these impairments, then the claimant is per se disabled without consideration of the claimant's age, education, or work history. Id. Fourth, the impairment must prevent claimant from doing past relevant work. See 20 C.F.R. § § 416.920(e), 404.1520(e). The

13

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

ALJ will "review [claimants]' residual functional capacity and the physical and mental demands of the work [claimant] [has] done in the past." Id. Fifth, the severe impairment must prevent claimant from doing any other work. See 20 C.F.R. § § 416.920(f), 404.1520(f). If the claimant meets these standards, the ALJ will find the claimant to be disabled.

The ALJ's decision is conclusive upon this court if it is supported by "substantial evidence." See Onstead v. Sullivan, 962 F.2d 803, 804 (8th Cir. 1992). It is not the job of the Court to re-weigh the evidence or review the factual record de novo. See McClees v. Shalala, 2 F.3d 301, 302 (8th Cir. 1994); Murphy v. Sullivan, 953 F.2d 383, 384 (8th Cir. 1992). Instead, the Court must simply determine whether the quantity and quality of evidence is enough so that a reasonable mind might find it adequate to support the ALJ's conclusion. See Davis v. Apfel, 239 F.3d 962, 966 (8th Cir. 2001) (citing McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)). Weighing the evidence is a function of the ALJ, who is the fact-finder. See Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987).

Even if a court finds that there is a preponderance of the evidence against the ALJ's decision, that decision must be affirmed if it is supported by substantial evidence. See Clark v. Heckler, 733 F.2d 65, 68 (8th Cir. 1984). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002). In Bland v. Bowen, 861 F.2d 533 (8th Cir. 1988), the Eighth Circuit Court of Appeals held:

> [t]he concept of substantial evidence is something less than the weight of the evidence and it allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the Secretary may decide to grant or deny benefits without being subject to reversal on appeal.

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

Id. at 535.  See also Culbertson v. Shalala, 30 F.3d 934, 939 (8th Cir. 1994);  Turley v. Sullivan, 939 F.2d 524, 528 (8th Cir. 1991).

Thus, an administrative decision which is supported by substantial evidence is not subject to reversal merely because substantial evidence may also support an opposite conclusion or because the reviewing court would have decided differently.  See Krogmeier, 294 F.3d at 1022 (internal citations omitted).  See also Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000) (quoting Terrell v. Apfel, 147 F.3d 659, 661 (8th Cir. 1998)); Hutsell v. Massanari, 259 F.3d 707, 711 (8th Cir. 2001) (internal citations omitted).

To determine whether the Commissioner's final decision is supported by substantial evidence, the Court is required to review the administrative record as a whole and to consider:

> (1) The findings of credibility made by the ALJ;
>
> (2) The education, background, work history, and age of the claimant;
>
> (3) The medical evidence given by the claimant's treating physicians;
>
> (4) The subjective complaints of pain and description of the claimant's physical activity and impairment;
>
> (5) The corroboration by third parties of the claimant's physical impairment;
>
> (6) The testimony of vocational experts based upon proper hypothetical questions which fairly set forth the claimant's physical impairment; and
>
> (7) The testimony of consulting physicians.

See Brand v. Sec'y of Dept. of Health, Education and Welfare, 623 F.2d 523, 527 (8th Cir. 1980); Cruse v. Bowen, 867 F.2d 1183, 1184 (8th Cir. 1989).

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical impairment which can be expected to result

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

in death or has lasted or can be expected to last for a continuous period of not less than 12 months …." See 42 U.S.C. § 416(i)(1)(A); 42 U.S.C. § 423(d)(1)(A).  The plaintiff has the burden of proving that he has a disabling impairment.  See 42 U.S.C. § 423(d)(1); Pickner v. Sullivan, 985 F.2d 401, 403 (8th Cir. 1993); Roach v. Sullivan, 758 F. Supp. 1301, 1306 (E.D. Mo. 1991).

"While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced." Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).  When evaluating evidence of pain, the ALJ must consider:

> (1) the claimant's daily activities;
>
> (2) the subjective evidence of the duration, frequency, and intensity of the claimant's pain;
>
> (3) any precipitating or aggravating factors;
>
> (4) the dosage, effectiveness, and side effects of any medication; and
>
> (5) the claimant's functional restrictions.

See Baker v. Sec'y of Health and Human Servs., 955 F.2d. 552, 555 (8th Cir. 1992); Polaski, 739 F.2d at 1322. The absence of objective medical evidence is just one factor to be considered in evaluating the plaintiff's credibility. See id.  The ALJ must also consider the plaintiff's prior work record, observations by third parties and treating and examining doctors, as well as the plaintiff's appearance and demeanor at the hearing. See id.; Cruse, 867 F.2d at 1186.

The ALJ must make express credibility determinations and set forth the inconsistencies in the record which cause him to reject the plaintiff's complaints.  See  Masterson v. Barnhart, 363 F.3d 731, 738 (8th Cir. 2004); Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995); Robinson v. Sullivan, 956

16

F.2d 836, 841(8th Cir. 1992); <u>Ricketts v. Sec'y of Health and Human Servs.</u>, 849 F.2d 661, 664 (8th Cir. 1990); <u>Jeffery v. Sec'y of Health and Human Servs.</u>, 849 F.2d 1129, 1132 (8th Cir. 1988). It is not enough that the record contains inconsistencies; the ALJ must specifically demonstrate that he considered all of the evidence. <u>See</u> <u>Robinson</u>, 956 F.2d at 841; <u>Butler v. Sec'y of Health and Human Servs.</u>, 850 F.2d 425, 426 (8th Cir. 1988). The ALJ, however, "need not explicitly discuss each <u>Polaski</u> factor." <u>Strongson v. Barnhart</u>, 361 F.3d 1066, 1072 (8th Cir. 2004). The ALJ need only acknowledge and consider those factors. <u>See</u> <u>id.</u> Although credibility determinations are primarily for the ALJ and not the court, the ALJ's credibility assessment must be based on substantial evidence. <u>See</u> <u>Rautio v. Bowen</u>, 862 F.2d 176, 179 (8th Cir. 1988); <u>Millbrook v. Heckler</u>, 780 F.2d 1371, 1374 (8th Cir. 1985).

Where the ALJ holds that the plaintiff cannot return to his past relevant work, the burden shifts to the Commissioner to show other work that the plaintiff could perform in the national economy. <u>See</u> <u>Nevland</u>, 204 F.3d at 857 (citing <u>McCoy v. Schweiker</u>, 683 F.2d 1138, 1146-7 (8th Cir. 1982) (en banc). This is a two-part burden. The Commissioner must first prove that the claimant retains the residual functional capacity to perform other kinds of work. <u>Id</u>. Residual functional capacity is defined as what the claimant can do despite his or her limitations, 20 C.F.R. § 404.1545(a), and includes an assessment of physical abilities and mental impairments. <u>See</u> 20 C.F.R. § 404.1545(b-e). The Commissioner has to prove this by substantial evidence. <u>See</u> <u>Warner v. Heckler</u>, 722 F.2d 428, 431(8th Cir. 1983). Second, once the plaintiff's capabilities are established, the Commissioner has the burden of demonstrating that there are jobs available in the national economy that can realistically be performed by someone with the plaintiff's qualifications and capabilities. <u>See</u> <u>Nevland</u>, 204 F.3d at 857.

To satisfy the Commissioner's burden, the testimony of a vocational expert may be used. An ALJ posing a hypothetical to a vocational expert is not required to include all of a plaintiff's limitations, but only those which he finds credible. See Rautio, 862 F.2d at 180; Roberts v. Heckler, 783 F.2d 110, 112 (8th Cir. 1985). Use of the Medical-Vocational Guidelines is appropriate if the ALJ discredits the plaintiff's subjective complaints of pain for legally sufficient reasons. See Carlock v. Sullivan, 902 F.2d 1341, 1343 (8th Cir. 1990); Hutsell v. Sullivan, 892 F.2d 747, 750 (8th Cir. 1989).

## VI.
## DISCUSSION

The issue before the court is whether substantial evidence supports the Commissioner's final determination that Plaintiff was not disabled. See Onstead, 962 F.2d at 804. Substantial evidence is that which a reasonable mind might accept as adequate to support the Commissioner's conclusion. See Jones v. Chater, 86 F.3d 823, 826 (9th Cir. 1996). The possibility of drawing two inconsistent conclusions from the evidence does not prevent the Commissioner's findings from being supported by substantial evidence. See Browning v. Sullivan, 958 F.2d 817, 821 (9th Cir. 1991). Thus, even if there is substantial evidence that would support a decision opposite to that of the Commissioner, the court must affirm her decision as long as there is substantial evidence in favor of the Commissioner's position. See Jones, 86 F.3d at 826.

Plaintiff argues that the ALJ committed reversible error by finding that Plaintiff was not disabled based on the Medical-Vocational Guidelines ("Guidelines"); because Plaintiff has a non-exertional mental impairment, Plaintiff contends that the ALJ should not have relied on the Guidelines. Plaintiff also contends that the ALJ erred in determining her residual functional capacity (RFC") because he disregarded the opinion of three doctors upon determining her RFC. Plaintiff

18

further contends that the ALJ committed reversible error in failing to discuss the testimony of Plaintiff's social worker, Ms. Hunt.

**A.     Plaintiff's RFC**:

Plaintiff argues that the ALJ erred in determining her RFC because he failed to rely on the Assessment of Plaintiff conducted by Dr. Colen on June 9, 2003, because he failed to rely on the June 17, 2003, report of Dr. Favazza, and because he failed to rely on the January 12, 2004 Assessment of Plaintiff conducted by Dr. Houghton. Plaintiff further argues that the ALJ should have given controlling weight to the opinions of these health professionals. She also argues that Dr. Favazza and Dr. Houghton were her treating physicians and that, as such, their opinions should have been controlling. Doc. 14 at 14-15. It is not clear from Plaintiff's brief if she means to suggest also that Dr. Colen was a treating doctor.

The Regulations define RFC as "what [the claimant] can still do" despite his or her "physical or mental limitations." 20 C.F.R. § 404.1545(a). "When determining whether a claimant can engage in substantial employment, an ALJ must consider the combination of the claimant's mental and physical impairments." Lauer v. Apfel, 245 F.3d 700, 703 (8th Cir. 2001). To determine a claimant's RFC, the ALJ must move, analytically, from ascertaining the true extent of the claimant's impairments to determining the kind of work the claimant can still do despite his or her impairments. In contrast to the first four steps of the sequential evaluation, in which the claimant carries the burden of proof, the Commissioner has the burden of establishing the claimant's RFC. See Singh v. Apfel, 222 F.3d 448, 451 (8th Cir. 2000). Additionally, a "'claimant's residual functional capacity is a medical question.'" Lauer, 245 F.3d at 704 (quoting Singh, 222 F.3d at 451). The Eighth Circuit clarified in Lauer, 245 F.3d at 704, that "'[s]ome medical evidence,' Dykes v. Apfel, 223 F.3d 865, 867 (8th

Cir.2000) (per curiam ), must support the determination of the claimant's RFC, and the ALJ should obtain medical evidence that addresses the claimant's 'ability to function in the workplace,' <u>Nevland v. Apfel</u>, 204 F.3d 853, 858 (8th Cir.2000)." Thus, an ALJ is "required to consider at least some supporting evidence from a professional." <u>Id.</u>

RFC is "an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities." SSR 96-8p, 1996 WL 374184, at *2 (S.S.A. July 2, 1996). Additionally, "RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis, and the RFC assessment must include a discussion of the individual's abilities on that basis." <u>Id.</u> Moreover, "[i]t is incorrect to find that an individual has limitations or restrictions beyond those caused by his or her medical impairment(s) including any related symptoms, such as pain." <u>Id.</u>

"RFC is an issue only at steps 4 and 5 of the sequential evaluation process." <u>Id.</u> at *3. At step 4, "the RFC must not be expressed initially in terms of the exertional categories of 'sedentary,' 'light,' 'medium,' 'heavy,' and 'very heavy' work because the first consideration at this step is whether the individual can do past relevant work as he or she actually performed it." <u>Id.</u> At step 5, where a claimant's RFC is expressed in terms of exertional categories, it must also be determined whether the claimant can do the full range of work at a given exertional level. The claimant must be able to "perform substantially all of the exertional and nonexertional functions required in work at that level. Therefore, it is necessary to assess the individual's capacity to perform each of these functions in order to decide which exertional level is appropriate and whether the individual is capable of doing

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

the full range of work contemplated by the exertional level." Id.

The Eighth Circuit has recently held in Eichelberger v. Barnhart, 390 F.3d 584 (8th Cir. 2004), as follows:

> A disability claimant has the burden to establish her RFC. Masterson v. Barnhart, 363 F.3d 731, 737 (8th Cir. 2004). The ALJ determines a claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians and others, and the claimant's own descriptions of his or her limitations. Id. We have held that a "claimant's residual functional capacity is a medical question." Lauer v. Apfel, 245 F.3d 700 (8th Cir. 2001). "[S]ome medical evidence" must support the determination of the claimant's RFC, Dykes v. Apfel, 223 F.3d 865, 867 (8th Cir. 2000) (per curiam), and the ALJ should obtain medical evidence that addresses the claimant's "ability to function in the workplace." Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000).

Id. at 591.

Upon making an RFC assessment an ALJ must first identify a claimant's functional limitations or restrictions and then assess his or her work-related abilities on a function-by-function basis. See Masterson, 363 F.3d at 737. In the matter under consideration the ALJ considered Plaintiff's medical history in determining her RFC. Contrary to Plaintiff's assertion, the ALJ did consider Dr. Colen's Assessment of June 9, 2003. The ALJ merely stated that he was not giving controlling weight to this Assessment. (Tr. 19). In particular, the ALJ considered that the June 2003 Assessment stated that Plaintiff has a "fair" ability to follow work rules, relate to co-workers, deal with the public, use judgment, interact with supervisors, deal with work stresses, function independently, maintain attention/concentration, behave in an emotionally stable manner, relate predictably in social situations, and demonstrate reliability. (Tr. 18). The court further notes that Dr. Colen also reported in his Assessment that Plaintiff's ability was good in the area of maintaining personal appearance and that Plaintiff can manage benefits in her own best interest.

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

Contrary to Plaintiff's assertion, the ALJ did consider that Dr. Hougton conducted a January 2004 Assessment of Plaintiff. As he did with the June 2003 Assessment, the ALJ merely said he was not giving controlling weight to this Assessment. (Tr. 19). The ALJ did consider that the Assessment of January 2004 reported that Plaintiff had poor ability in regard to certain areas but that she had good ability to relate to co-workers, interact with supervisors, and function independently. (Tr. 18). The ALJ noted, however, that Dr. Houghton failed to complete the January 2004 Assessment form in its entirety and that, in particular, he failed to "describe any limitations or medical/clinical findings to support his assessment or explanation for such severe limitations" which he found. (Tr. 19). Because Dr. Houghton failed to report medical/clinical findings to support his conclusions in the January 2004 Assessment, the ALJ chose to give greater weight to progress notes of January 26, 2004. The ALJ considered that these progress notes were from Behavioral Health and that Dr. Houghton is affiliated with Behavioral Health. Additionally, the court notes that the progress notes of January 26, 2004, from Behavioral Health state that Plaintiff was doing reasonably well with mood and anxiety. (Tr. 194).

While the ALJ did not specifically reference the June 17, 2003 Assessment prepared by Dr. Favazza, the ALJ did reference Dr. Favazza's earlier records and noted that this doctor diagnosed Plaintiff with bipolar disorder mixed with general anxiety disorder and that in October 2002 Dr. Favazza noted that Plaintiff was sleeping better, had increased energy, and was free from side-effects from her medications. (Tr. 17). The court notes that while the June 17, 2003 Assessment reports that Plaintiff had severe limitations in some areas it also states that she had *moderate* limitations in regard to friendships/peer relationships, activities of daily living, and ability to concentrate and that she had *minimal symptoms* in regard to financial situations and hobbies/interests/play activities. In a narrative

addressing Plaintiff's ability to control her temper this Assessment further states that Plaintiff "has minor problem - but usually blocks people out when she does not want to deal with issues." In a narrative addressing "ability to control temper" the Assessment further states that Plaintiff had "little problems." In a narrative addressing hobbies, the Assessment states that Plaintiff was "well to bowl, play pool, eat out, be social and talk with friends." (Tr. 195-200).

To the extent that the ALJ did not specifically address the June 17, 2003 Assessment the court notes that such an omission does not require a court to set aside an administrative finding where the omission had no bearing on the outcome. As described above, this Assessment supports the ALJ's decision. Moreover, an ALJ's failure to cite specific evidence, in this case the June 17, 2003 Assessment, does not indicate that such evidence was not considered. See Montgomery v. Chater, 69 F.3d 273,275 (8th Cir. 1995). See also Wheeler v. Apfel, 224 F.3d 891, 896 n.3 (8th Cir. 2000) (citing Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998) (holding that an ALJ is not required to discuss every piece of evidence submitted and that an "ALJ's failure to cite specific evidence does not indicate that such evidence was not considered"). Based on the entire content of the June 17, 2003 Assessment and the record as a whole, assuming, arguendo, that the ALJ did not consider this Assessment, the court finds that if considered, the June 17, 2003 Assessment would not have had an effect on the outcome of this matter. See Reynolds v. Chater, 82 F.3d 254, 258 (8th Cir. 1996). Therefore, the failure of the ALJ to specifically address this Assessment does not require reversal.

To the extent that Dr. Favazza and Dr. Houghton and/or Dr. Colen[1] are Plaintiff's treating physicians and to the extent the ALJ did not fully credit their opinions, the opinions and findings of

---

[1]     The court notes that there is no evidence on the record that Dr. Colen ever treated Plaintiff. As such, the record does not suggest that he was a treating doctor. See 20 C.F.R. § 404.1527(d)(2).

a plaintiff's treating physician are entitled to considerable weight. Indeed, if they are not controverted by substantial medical or other evidence, they are to be given controlling weight. See Cunningham v. Apfel, 222 F.3d 496, 502 (8th Cir. 2000) (citing Ghant v. Bowen, 930 F.2d 633, 639 (8th Cir.1991); Kelley v. Callahan, 133 F.3d 583, 589 (8th Cir.1998)). However, while the opinion of the treating physician should be given great weight, this is true only if the treating physician's opinion is *based on sufficient medical data*. See Chamberlain v. Shalala, 47 F.3d 1489, 1494 (8th Cir. 1985) (citing Matthews v. Bowen, 879 F.2d 422, 424 (8thCir.1989) (holding that opinions of treating doctors are not conclusive in determining disability status and must be *supported by medically acceptable clinical or diagnostic data*). Where diagnoses of treating doctors are not supported by medically acceptable clinical and laboratory diagnostic techniques, the court need not accord such diagnoses great weight. See Veal v. Bowen, 833 F.2d 693, 699 (7th Cir. 1987).

Moreover, a brief, conclusory letter from a treating physician stating that the applicant is disabled is not binding on the Secretary. See Ward v. Heckler, 786 F.2d 844, 846 (8th Cir.1986) (per curiam) ("Even statements made by a claimant's treating physician regarding the existence of a disability have been held to be properly discounted in favor of the contrary medical opinion of a consulting physician where the treating physician's statements were conclusory in nature."). See also Chamberlain, 47 F.3d at 1494; Barrett v. Shalala, 38 F.3d 1019, 1023 (8th Cir.1994) (citing Thomas v. Sullivan, 928 F.2d 255, 259 (8th Cir.1991)); King v. Heckler, 742 F.2d 968, 973 (6th Cir. 1984) (holding that the ALJ is not bound by conclusory statements of total disability by a treating physician where the ALJ has identified good reason for not accepting the treating physician's opinion, such as its not being supported by any detailed, clinical, diagnostic evidence).

Additionally, Social Security Regulation ("SSR") 96-2p states, in its "Explanation of Terms,"

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

that it "is an error to give an opinion controlling weight simply because it is the opinion of a treating source if it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or if it is inconsistent with other substantial evidence in the case record." 1996 WL 374188, at *2 (S.S.A. July 2, 1996).   Additionally, SSR 96-2p clarifies that 20 C.F.R.  § § 404.1527 and 416.927 require that  the ALJ provide "good reasons in the notice of the determination  or decision for the weight given to a treating source's medical opinion(s)."  Id. at *5.

The Eighth Circuit holds that "if a treating physician ... has not issued an opinion which can be adequately related to the [Social Security Act's] disability standard, the ALJ is obligated ... to address a precise inquiry to the physician so as to clarify the record."  Vaughn v. Heckler, 741 F.2d 177, 179 (8th Cir. 1984) (quoting Lewis v. Schweiker, 720 F.2d 487, 489 (8th Cir.1983)).

When considering the weight to be given the opinion of a treating doctor, the entire record must be evaluated as a whole. See Wilson v. Apfel, 172 F.3d 539, 542 (8th Cir. 1999) (quoting Cruze v. Chater, 85 F.3d 1320, 1324-25 (8th Cir. 1996) ("Although a treating physician's opinion is generally entitled to substantial weight, such opinion does not automatically control, since the record must be evaluated as a whole.").  In the matter under consideration the evidence which contradicts the conclusory opinion of Dr. Houghton in his January 2004 Assessment comes from Dr. Houghton's own treatment notes of that same month as well as from other medical treatment notes. See Chamberlain, 47 F.3d at 1494; Veal, 833 F.2d at 699. As such, the ALJ's choosing to credit Dr. Houghton's January 2004 clinical findings over the conclusory and unsupported statements in his January 2004 Assessment is consistent the Regulations and controlling case law and is supported by substantial evidence on the record as a whole. See Weber v. Apfel, 164 F.3d 431, 432 (8th Cir. 1999).

The ALJ did, however, upon determining Plaintiff's RFC consider the June 2003 Assessment completed by Dr. Colen, the January 2004 Assessment completed by Dr. Houghton, and Dr. Favazza's notes from March 2002 to October 2002, Dr. Favazza's progress notes of October 2002, and records of Behavioral Health from December 2002 to March 2004, which included Dr. Favazza's notes. In particular the ALJ considered that medical records of December 2002 reflect that Plaintiff was sleeping well and had decreased paranoia and panic; that one of Plaintiff's sons was living with her; and that she might start a job soon. He further considered records of July 2003 which stated that Plaintiff's anxiety had increased since all her children had been returned from DFS custody. The ALJ also considered that March 4, 2004, records indicate that Plaintiff's mood was good; that she was generally doing well; that she was eating and sleeping well; that her children were doing well; and that she had no complaints or side effects. See Estes v. Barnhart, 275 F.3d 722, 725 (8th Cir. 2002); Murphy, 953 F.2d at 384; Warford v. Bowen, 875 F.2d 671, 673 (8th Cir. 1989) (holding that a medical condition that can be controlled by treatment is not disabling). See also Richmond v. Shalala, 23 F.3d 1441, 1444 (8th Cir. 1994) (holding that the absence of side effects from medication is a proper factor for the ALJ to consider when determining whether a plaintiff's complaints of disabling pain are credible).

In regard to Plaintiff's medical records, the ALJ considered that no doctor who treated Plaintiff stated or implied that she was totally incapacitated and that "[n]o specific work-related limitations, which are more restrictive than those established by this decision, have been place on [Plaintiff] by any doctor." (Tr. 19). The ALJ also considered that no doctor limited Plaintiff to such a significant degree or indicated that she was unable to take care of herself. A record which contains no physician opinion of disability detracts from claimant's subjective complaints. See Edwards v.

26

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

Sec'y of Health & Human Servs., 809 F.2d 506, 508 (8th Cir. 1987); Fitzsimmons v. Mathews, 647 F.2d 862, 863 (8th Cir. 1981).

In addition to reports of Plaintiff's doctors, the ALJ considered Ms. Elliot's report of August 2002 in which she stated that she was pleased with Plaintiff's progress; that Plaintiff was doing well in regard to decision making and with reunification with one of her three children; that she had never seen Plaintiff function better; and that Plaintiff was emotionally more stable. While Ms. Elliot's notes of August 2002 predate her amended onset date, the court notes that Ms. Hunt's testimony reflects that at the time of the hearing all three of Plaintiff's children were living with her. The court further notes that medical records of January 2003 reflect that Plaintiff was receiving unemployment compensation. Indeed, application for unemployment compensation benefits adversely affects a claimant's credibility. "A claimant may admit an ability to work by applying for unemployment compensation benefits because such an applicant must hold himself out as available, willing and able to work." Jernigan v. Sullivan, 948 F.2d 1070, 1074 (8th Cir. 1991). Thus, the fact that Plaintiff received unemployment benefits is evidence which negates her claim of disability. See id.

Thus, the court finds that upon determining Plaintiff's RFC the ALJ considered the medical evidence of record and that his consideration of Plaintiff's medical records is consistent with the Regulations and controlling case law.

After considering Plaintiff's medical records the ALJ also considered Plaintiff's testimony and found it not to be fully credible. Additionally, the ALJ found her limitations of daily activities were a matter of choice; that there was no evidence of serous deterioration; that Plaintiff had no more than mild to moderate mental limitations; that she had not required repeated psychiatric hospitalizations or intensive psychotherapy; that her medications effectively reduce her symptoms; and that, therefore,

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

Plaintiff's allegation of total disability is not supported by the evidence. The court notes that, despite the fact that Plaintiff was diagnosed with bipolar disorder, the ALJ's conclusion, after considering the severity of her symptoms, that Plaintiff is not disabled is consistent with the Regulations and case law. The mere existence of a mental condition is not per se disabling. See Dunlap v. Harris, 649 F.2d 637, 638 (8th Cir. 1981). Where a claimant's mental or emotional problems do not result in a marked restriction of his daily activities, constriction of interests, deterioration of personal habits, or impaired ability to relate, they are not disabling. See Gavin v. Heckler, 811 F.2d 1195, 1200 (8th Cir. 1987). See also 20 C.F.R. § § 404.1520a and 416.920a.

The sequential process for evaluating mental impairments is set out in 20 C.F.R. § 404.1520a. This regulation states that the steps set forth in § 404.1520 also apply to the evaluation of a mental impairment. See § 404.1520a(a). Moreover, when a claimant is found to have a mental impairment, as in the matter under consideration, the ALJ must then analyze whether certain medical findings relevant to ability to work are present or absent. See 20 C.F.R.§ 404.1520a(b)(1). The procedure then requires the ALJ to rate the degree of functional loss resulting from the impairment in four areas of function which are deemed essential to work. See 20 C.F.R. § 404.1520a(c)(3). Those areas are: (1) activities of daily living; (2) social functioning; (3) concentration, persistence or pace; and (4) deterioration or decompensation in work or work-like settings. See 20 C.F.R. § 404.1520a(c)(3). In the instant matter, the ALJ took these factors into consideration as set forth above.

The Regulations provide that when the degree of limitation in the first three functional areas is "none" or "mild" and "none" in the area of decompensation, an impairment is not severe, "unless the evidence otherwise indicates that there is more than a minimal limitation in [a claimant's] ability to do basic work activities." 20 C.F.R. § 404.1520a(d)(1). When it is determined that a claimant's

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

mental impairment is severe, the ALJ must next determine whether the impairment meets or is equivalent in severity to a listed mental disorder. This is done by comparing the medical findings about a claimant's impairment and the rating of the degree of functional limitation to the criteria of the appropriate listed mental disorder. See 20 C.F.R. § 404.1520a(d)(2). If it is determined that a claimant has "a severe mental impairment(s) that neither meets nor is equivalent in severity to any listing," the ALJ must then assess the claimant's RFC. 20 C.F.R. § 404.1520a(d)(3).

The court further notes that 20 C.F.R. Ch. lll, Pt. 404, Supt. P, App.1 § 12.00(a) states, in relevant part, that:

> The evaluation of disability on the basis of mental disorders requires documentation of a medically determinable impairment(s), consideration of the degree of limitation such impairment(s) may impose on your ability to work, and consideration of whether these limitations have lasted or are expected to last for a continuous period of at least 12 months.

After considering the medical evidence, the ALJ in the matter under consideration proceeded to consider Plaintiff's functional limitations as evidenced by her activities of daily living; her social functioning; and her deterioration or decompensation in work or work-like settings as required by 20 C.F.R. § 404.1520a(b)-(c). Consistent with 20 C.F.R. § 404.1520a(d)(3), the ALJ concluded that Plaintiff had the following RFC: Due to Plaintiff's psychological problems, she has a mild restriction in her daily living activities, as well as a mild difficulty in maintaining social functioning. She is limited to skilled or semi-skilled tasks with which she is already familiar or else unskilled tasks that can be learned after a short demonstration or within thirty days. The court finds that the ALJ's determination of Plaintiff's RFC is consistent with the Regulations and applicable case law and that it is supported by substantial evidence as set forth above, including the records of Dr. Colen, Dr. Favazza, and Dr. Houghton and the records of Ms. Elliot.

29

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

Consistent with the Regulations, after determining Plaintiff's RFC the ALJ considered the requirements of Plaintiff's past work as well as the mental demands of unskilled work. The ALJ noted that Plaintiff's past relevant work did not require the performance of work-related activities precluded by Plaintiff's RFC. The ALJ, therefore, concluded, pursuant to the sequential analysis applicable to a mental disorder that Plaintiff can perform her past relevant work.

**B.      ALJ's Reliance on the Guidelines:**

Plaintiff argues that the ALJ should have solicited the testimony of a vocational expert because Plaintiff has non-exertional mental limitations. Prior to finding Plaintiff not disabled the ALJ concluded that Plaintiff does not have any "medically diagnosed physiologic or anatomic abnormality that could reasonably be expected to result in any limitation in [Plaintiff's] ability to perform basic work-related activities." (Tr. 20). The ALJ further concluded that "due to [Plaintiff's] psychological problems, she would have a *mild* restriction in her daily living activities, as well as *mild* difficulty in maintaining social functioning." (Tr.20) (emphasis added). The ALJ further concluded that Plaintiff is "limited to skilled or semi-skilled tasks with which she is already familiar or else unskilled tasks that can be learned after a short demonstration or within 30 days." (Tr. 20). Upon concluding that Plaintiff is not disabled the ALJ considered that "when a claimant's ability to perform work at all exertional levels is not significantly compromised by exertional limitations, a finding of 'not disabled' is appropriate." (Tr. 21). The ALJ then stated that:

> Since [Plaintiff's] ability to perform at all exertional levels is compromised by nonexertional limitations, the remaining work which [Plaintiff] is functionally capable of performing must be considered, in combination with [Plaintiff's] age, education, and work experience, to determine whether a vocational adjustment can be made. Considering the range of work, and using Section 204.00 as a framework for decision making, the undersigned finds that [Plaintiff] is able to make a vocational adjustment to perform work, which exists in significant numbers in the national economy.

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

(Tr. 21).

The ALJ then made a finding that Plaintiff's alleged non-exertional limitations were not credible and that her past relevant work did not require performance of work-related activities precluded by her RFC. The ALJ found, therefore, that Plaintiff was not disabled. (Tr. 21-22).

Resorting to the Guidelines is appropriate when there are no non-exertional impairments that substantially limit the ability of a claimant to perform substantially gainful activity. Indeed, once a determination is made that a claimant cannot perform past relevant work, the burden shifts to the Commissioner to prove there is work in the economy that the claimant can perform. See Robinson, 956 F.2d at 841. See also Reynolds, 82 F.3d at 258-59 (holding that when complaints of pain are explicitly discredited by legally sufficient reasons, Guidelines may be used). If the claimant is found to have only exertional impairments, the Commissioner may meet this burden by referring to the Medical Vocational Guidelines. See Robinson, 956 F.2d at 841. If, however, the claimant is also found to have non-exertional impairments that diminish the claimant's capacity to perform the full range of jobs listed in the Guidelines, the Commissioner must solicit testimony from a vocational expert to establish that there are jobs in the national economy that the claimant can perform. See id.

Additionally, 20 C.F.R. § 404.1560 states in relevant part in regard to a claimant's ability to perform past relevant work:

(b) Past relevant work ...

(2) Determining whether you can do your past relevant work. We will ask you for information about work you have done in the past. We may also ask other people who know about your work. (See § 404.1565(b).) We may use the services of vocational experts or vocational specialists, or other resources, such as the "Dictionary of Occupational Titles" and its companion volumes and supplements, published by the Department of Labor, to obtain evidence we need to help us determine whether you can do your past relevant work, given your residual functional capacity. A vocational

31

expert or specialist may offer relevant evidence within his or her expertise or knowledge concerning the physical and mental demands of a claimant's past relevant work, either as the claimant actually performed it or as generally performed in the national economy. Such evidence may be helpful in supplementing or evaluating the accuracy of the claimant's description of his past work. In addition, a vocational expert or specialist may offer expert opinion testimony in response to a hypothetical question about whether a person with the physical and mental limitations imposed by the claimant's medical impairment(s) can meet the demands of the claimant's previous work, either as the claimant actually performed it or as generally performed in the national economy.

(3) If you can do your past relevant work. If we find that you have the residual functional capacity to do your past relevant work, we will determine that you can still do your past work and are not disabled. We will not consider your vocational factors of age, education, and work experience or whether your past relevant work exists in significant numbers in the national economy.

(c) Other work.

(1) If we find that your residual functional capacity is not enough to enable you to do any of your past relevant work, we will use the same residual functional capacity assessment we used to decide if you could do your past relevant work when we decide if you can adjust to any other work. We will look at your ability to adjust to other work by considering your residual functional capacity and your vocational factors of age, education, and work experience. Any other work (jobs) that you can adjust to must exist in significant numbers in the national economy (either in the region where you live or in several regions in the country).

(2) In order to support a finding that you are not disabled at this fifth step of the sequential evaluation process, we are responsible for providing evidence that demonstrates that other work exists in significant numbers in the national economy that you can do, given your residual functional capacity and vocational factors. We are not responsible for providing additional evidence about your residual functional capacity because we will use the same residual functional capacity assessment that we used to determine if you can do your past relevant work.

SSR 85-15, 1985 WL 56857 (S.S.A. 1985), states, in relevant part, that:

The purpose of this revision to SSR 83-13 and SSR 85-7 is to emphasize, in the sections relating to mental impairments: (1) that the potential job base for mentally ill claimants without adverse vocational factors is not necessarily large even for individuals who have no other impairments, unless their remaining mental capacities

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

are sufficient to meet the intellectual and emotional demands of at least unskilled, competitive, remunerative work on a sustained basis; and (2) that a finding of disability can be appropriate for an individual who has a severe mental impairment which does not meet or equal the Listing of Impairments, even where he or she does not have adversities in age, education, or work experience.

SSR 83-10, 1983 WL 31251, at *1 (S.S.A. 1983), clarifies the proper use of the Guidelines in the sequential analysis for determining whether a claimant is disabled and states in relevant part:

[T]he fifth and last step in the process, the individual's residual functional capacity (RFC) in conjunction with his or her age, education, and work experience, are considered to determine whether the individual can engage in any other substantial gainful work which exists in the national economy. (See the glossary at the end of the policy statement for definitions of terms and concepts commonly used in medical-vocational evaluation--e.g., RFC.)

To increase the consistency and promote the uniformity with which disability determinations are made at this step at all levels of adjudication, the regulations for determining disability were expanded in February 1979. Appendix 2 was provided to establish specific numbered table rules for use in medical-vocational evaluation.

SSR 83-10, 1983 WL 31251, at * 6, defines a nonexertional impairment as "[a]ny impairment which does not directly affect the ability to sit, stand, walk, lift, carry, push, or pull. This includes impairments which affect the mind, vision, hearing, speech, and use of the body to climb, balance, stoop, kneel, crouch, crawl, reach, handle, and use of the fingers for fine activities." SSR 83-10, 1983 WL 31251, at *7, defines nonexertional limitation as "[a]n impairment-caused limitation of function which directly affects capability to perform work activities other than the primary strength activities." SSR 83-10, 1983 WL 31251, at * 7, defines nonexertional restriction as an "impairment-caused need to avoid one or more environmental conditions in a workplace."

The Eighth Circuit has explained the circumstances when a claimant has nonexertional limitations but the ALJ need not resort to the testimony of a VE. The court held in Sanders v. Sullivan, 983 F.2d 822, 823 (8th Cir. 1992), that:

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

"[A]n ALJ may use the Guidelines even though there is a nonexertional impairment if the ALJ finds, and the record supports the finding, that the nonexertional impairment does not diminish the claimant's residual functional capacity to perform the full range of activities listed in the Guidelines." Thompson v. Bowen, 850 F.2d 346, 349-50 (8th Cir.1988). However, if the claimant's nonexertional impairments diminish his or her residual functional capacity to perform the full range of activities listed in the Guidelines, the Secretary must produce expert vocational testimony or other similar evidence to establish that there are jobs available in the national economy for a person with the claimant's characteristics. Id. at 349. "Nonexertional limitations are limitations other than on strength but which nonetheless reduce an individual's ability to work." Asher v. Bowen, 837 F.2d 825, 827 n. 2 (8th Cir.1988). Examples include "mental, sensory, or skin impairments, as well as impairments which result in postural and manipulative limitations or environmental restrictions." Id.; See 20 C.F.R., Pt. 404, Subpt. P, App. 2, § 200.00(e) (1992).

See also Harris v. Shalala, 45 F.3d 1190, 1194 (8th Cir.1995).

The ALJ in the matter under consideration found that Plaintiff's ability to perform work at all exertional levels is compromised by her nonexertional limitations but that her alleged non-exertional limitations were not credible and that her past relevant work did not require performance of tasks precluded by her RFC. The court has found above that the ALJ's determination of Plaintiff's RFC is based on substantial evidence. This RFC includes the ability to engage in semi-skilled tasks with which Plaintiff was already familiar as well as only mild restrictions in daily living activities and maintaining social functioning. Moreover, medical records of December 2, 2002, state that Plaintiff was sleeping well; that things were going well; and that she had decreased panic and paranoia. Additionally, medical records of January 2003, reflect that Plaintiff had a good Christmas and was receiving unemployment compensation. As stated above, application for unemployment compensation contradicts a claimant's allegation that she is unable to work. See Jernigan, 948 F.2d at 1074. Moreover, as found above, Dr. Favazza's records as well as Dr. Colen's and Dr. Houghton's Assessments of Plaintiff support the ALJ's determination of Plaintiff's limitations. Based on the

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

medical records as described in detail above, the court finds that the ALJ's conclusion that Plaintiff's nonexertional limitations do not preclude her performing the full range of activities required by her past relevant work is supported by substantial evidence on the record as a whole. See Sanders, 983 F.2d at 823. As such, contrary to Plaintiff's assertion, the ALJ was not required to consult a VE that work exists in the national economy which Plaintiff can perform. See Harris, 45 F.3d at 1194; Sanders, 983 F.2d at 823.

**C.      Testimony of Carol Hunt, Plaintiff's Social Worker:**

Plaintiff contends that while the ALJ discussed some of Ms. Hunt's testimony, he did not give proper weight to her testimony. Relying on Polaski, 739 F.2d at 1322, Plaintiff argues that the ALJ must consider the observations of third parties. First, the court notes that by Plaintiff's admission the ALJ did consider Ms. Hunt's testimony. Second, the court notes that while the ALJ did not make express credibility findings in regard to Ms. Hunt's testimony, Polaski does not require that he do so. See Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2002) ("Although specific articulation of credibility findings is preferable, we consider the lack thereof to constitute a deficiency in opinion-writing that does not require reversal because the ultimate finding is supported by substantial evidence in the record.") (citing Reynolds, 82 F.3d at 258).[2] Third, the court notes that Ms. Hunt's testimony is not necessarily inconsistent with the ALJ's conclusion that Plaintiff is not disabled.

_____

[2]      The Eighth Circuit has frequently criticized the failure of the ALJ to consider subjective testimony of a claimant's family and others. See Robinson, 956 F.2d at 841 (holding that despite the Eighth Circuit's repeated directives that the Secretary specifically discuss each credibility determination made, the ALJ failed to state the reasons for discrediting the testimony of the claimant's wife). The court has held in the past that the failure to make credibility determinations concerning such evidence required reversal and remand. See Smith v. Heckler, 735 F.2d 312, 317 (8th Cir. 1984). However, while such testimony must be considered, no case directs belief in such testimony as credible. See Rautio v. Bowen, 862 F.2d 176, 180 (8th Cir. 1988).

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

Fourth, to the extent that the ALJ implicitly discredited Ms. Hunt's testimony, the court notes that an ALJ need not specifically outline his reasons for rejecting third-party testimony. See Reynolds, 82 F.3d at 258 ("Although we again reiterate that it is preferable to have explicit, specific findings concerning the credibility of each witness, any deficiency in this case does not require reversal because the ALJ's conclusion is supported by substantial evidence."). As the court has found above that the ALJ's decision in regard to Plaintiff's RFC is supported by substantial evidence, the court further finds, to the extent that the ALJ did not articulate his reasons for discrediting Ms. Hunt, that the ALJ's decision is not subject to reversal.

## VII.
## CONCLUSION

For the reasons set forth above, the court finds that substantial evidence on the record as a whole supports the Commissioner's decision that Plaintiff is not disabled.

Accordingly,

**IT IS HEREBY RECOMMENDED** that the relief sought by Plaintiff in her Brief in Support of Complaint be **DENIED.** [14]

**IT IS FURTHER RECOMMENDED** that the relief sought by Defendant in her Brief in Support of Answer be **GRANTED.** [15]

The parties are advised that they have eleven (11) days in which to file written objections to these recommendations pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good

PDF created with FinePrint pdfFactory trial version www.pdffactory.com

cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact.  See Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990).

/s/Mary Ann L. Medler
MARY ANN L. MEDLER
UNITED STATES MAGISTRATE JUDGE

Dated this  25th  day of  May, 2005.

PDF created with FinePrint pdfFactory trial version www.pdffactory.com